**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★  JUN 11 2018  ★

BROOKLYN OFFICE

JMK/DK:DCP:JPM/GM/DK
F. #2016R01087

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against –

SOCIÉTÉ GÉNÉRALE S.A.,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**INFORMATION**

Cr. No. 18 CR 253

(T. 18, U.S.C., §§ 371 and 3551 et seq.)

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise stated:

INTRODUCTION

I.    The Defendant and Relevant FCPA Definitions and Entities

    1.    The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1 et seq., was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

    2.    The defendant SOCIÉTÉ GÉNÉRALE S.A. ("SOCIÉTÉ GÉNÉRALE" or "the Company") was a financial institution and global financial services company headquartered in Paris, France, which maintained a subsidiary financial services company and a branch located in New York, New York.  SOCIÉTÉ GÉNÉRALE was a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

government function on behalf of Libya and was a client of the defendant SOCIÉTÉ GÉNÉRALE.   The CBL was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

8.     The Libyan Arab Foreign Bank ("LAFB") was a Libyan bank that was owned and controlled by the CBL.   The LAFB performed a government function on behalf of Libya and was a client of the defendant SOCIÉTÉ GÉNÉRALE.   The LAFB was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

9.     The Economic and Social Development Fund ("ESDF") was a Libyan state-owned financial institution that managed assets in Libya for the purpose of investing in major economic projects that supported the overall development of Libya and the distribution of its wealth.   The ESDF performed a state government function on behalf of Libya and was a client of the defendant SOCIÉTÉ GÉNÉRALE.   The ESDF was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

10.     The Libyan Investment Authority (the "LIA" and, together with the LAFB, ESDF, and CBL, the "Libyan State Agencies") was a Libyan government entity formed in 2006 to serve as a Libyan sovereign wealth fund, with a focus on investing and managing oil revenues on behalf of the Libyan government.   The LIA was overseen by senior Libyan government officials, was controlled by the Libyan government, and performed a government function on behalf of Libya.   The LIA was a client of the defendant SOCIÉTÉ GÉNÉRALE. The LIA was an "agency" and "instrumentality" of a foreign government, as those terms are used

3.     SGA Société Générale Acceptance, N.V. ("SGA"), a company organized under the laws of Curaçao, was a SOCIÉTÉ GÉNÉRALE subsidiary that issued structured notes, including those purchased by Libyan state institutions.   SGA partnered with Société Générale in the issuance of structured notes to Libyan state agencies and instrumentalities.   Structured notes were complicated securities that typically combine a debt obligation and a derivative component. SGA was a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

4.     The "Libyan Intermediary," an individual whose identity is known to the United States and the Company, was a dual Libyan and Italian national who resided in Dubai and London during the relevant period.   The Libyan Intermediary traveled to the United States and was a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) and (f)(1).

5.     The "Panamanian Company," an entity whose identity is known to the United States and the Company, was a company incorporated under the laws of Panama and controlled by the Libyan Intermediary.

6.     The "Investment Management Firm," an entity whose identity is known to the United States and the Company, was a U.S.-headquartered investment management firm that provided investment advisory and financial services to Libyan government investors.   The Investment Management Firm was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7.     The Central Bank of Libya ("CBL") was a Libyan state-owned financial and regulatory institution responsible for, among other things, managing the country's official monetary and foreign reserves and regulating its financial system.   The CBL performed a

2

in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

## II.    Relevant LIBOR Definitions and Entities

11.    The London Interbank Offered Rate ("LIBOR") was a benchmark interest rate overseen by the British Bankers' Association ("BBA"), a trade association based in London. LIBOR was calculated every London business day by averaging the rates at which designated banks, known as "Contributor Panel" banks, estimated that they could borrow unsecured funds from other banks in 10 currencies, including the United States Dollar ("USD").   Beginning in or about February 2009, the defendant SOCIÉTÉ GÉNÉRALE was a member of the USD LIBOR Contributor Panel.

12.    Contributor Panel banks for each currency submitted their estimated borrowing rates for 15 different borrowing periods ("tenors"), ranging in length from overnight to one year, including tenors of one month and three months.   Thomson Reuters, acting as an agent for the BBA, received electronically the Contributor Panel banks' estimated interest rate submissions at or before approximately 11:10 a.m. (GMT) on each business day in London. BBA rules required each Contributor Panel bank to present an honest and unbiased estimate of its borrowing costs.

13.    After receiving submissions from the Contributor Panel banks, Thomson Reuters: (a) ranked the submissions from highest to lowest; (b) excluded the four highest and four lowest submissions; and (c) averaged the remaining middle eight submissions ("the middle eight") to determine the official LIBOR rate (also referred to as the "fix").   Each business day in London, Thomson Reuters transmitted all of the Contributor Panel banks' individual LIBOR

4

submissions and the final averaged LIBOR rate to three data centers for worldwide publication, including one such data center in Hauppauge, New York.

14.     The published LIBOR rates were used to settle trades in various financial instruments, including Eurodollar futures contracts.   The term "Eurodollar" referred to United States Dollars on deposit in foreign banks for a fixed duration with a fixed yield.   Eurodollar futures contracts were LIBOR-based derivatives, and their price reflected the predicted LIBOR at the end of the term of a three-month, $1,000,000 offshore deposit.   Eurodollar futures contracts permitted investors to trade on their predictions of increases and decreases in LIBOR and enabled purchasers to hedge financial risk.   Eurodollar futures contracts were traded as commodities on the Chicago Mercantile Exchange in Chicago, Illinois.   Other financial instruments that referenced LIBOR included interest rate swaps, fixed-income futures, options, and forward rate agreements.   LIBOR was also used in some instances to calculate credit card interest rates and home mortgage interest rates.

III.    The Bribery Scheme

15.     Between in or about 2005 and in or about 2011, following the lifting of broad economic sanctions, the Libyan State Agencies sought to place substantial funds with financial institutions for investment purposes.   These placements were heavily sought after by a number of financial institutions, including the defendant SOCIÉTÉ GÉNÉRALE, as well as at least eight U.S.-based financial institutions.   By at least 2006, several SOCIÉTÉ GÉNÉRALE employees, together with their co-conspirators, knew that the Libyan Intermediary was paying bribes and providing other improper financial benefits to Libyan government officials in order to secure financial investments for SOCIÉTÉ GÉNÉRALE, and agreed to continue to use the Libyan Intermediary despite that knowledge.   In providing bribes and other improper benefits

on SOCIÉTÉ GÉNÉRALE'S behalf, and taking other acts in furtherance thereof, the Libyan Intermediary acted as an "agent" of SOCIÉTÉ GÉNÉRALE as that term is understood under U.S. law.   The SOCIÉTÉ GÉNÉRALE employees also concealed the bribes through payments to the Libyan Intermediary for purported "introduction" services.   During this time period, SOCIÉTÉ GÉNÉRALE, often in partnership with the Investment Management Firm, sold the Libyan State Agencies 13 structured notes (and one restructuring) worth a total of approximately $3.66 billion.   SOCIÉTÉ GÉNÉRALE earned profits of approximately $523 million in connection with these deals.   For each transaction, SOCIÉTÉ GÉNÉRALE paid the Libyan Intermediary's Panamanian Company a commission of between one and a half and three percent of the nominal amount of the investments made by the Libyan State Agencies.   In total, SOCIÉTÉ GÉNÉRALE paid the Libyan Intermediary approximately $90.74 million from approximately 2005 to 2009 for supposed "introductory" services.

IV.     The LIBOR Scheme

        16.     In or about and between May 2010 and October 2011, the defendant SOCIÉTÉ GÉNÉRALE engaged in a scheme to cause SOCIÉTÉ GÉNÉRALE to submit false and misleading USD LIBOR rates to the BBA via Thomson Reuters, so that it would appear to the public that SOCIÉTÉ GÉNÉRALE was able to borrow money at lower interest rates than the rates that were actually available to it.   The purpose of the scheme was to avoid anticipated reputational harm to SOCIÉTÉ GÉNÉRALE had it submitted honest estimates of its borrowing rates.

## COUNT ONE
### (Conspiracy to Bribe Foreign Officials)

17.     The allegations contained in paragraphs one through 16 are realleged and incorporated as though fully set forth in this paragraph.

18.     In or about and between 2006 and 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SOCIÉTÉ GÉNÉRALE, together with others, did knowingly and willfully conspire to commit offenses against the United States, to wit:

(a)     together with one or more domestic concerns and one or more agents of a domestic concern, to willfully and corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and foreign political party official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official and a foreign political party official, for purposes of: (i) influencing acts and decisions of such foreign official and foreign political party official in his or her official capacity; (ii) inducing such foreign official and foreign political party official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official and foreign political party official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendant SOCIÉTÉ GÉNÉRALE in obtaining and retaining business for and with, and directing business to SOCIÉTÉ GÉNÉRALE,

7

SGA, the Investment Management Firm, and others, contrary to Title 15, United States Code, Section 78dd-2; and

(b)        as a person other than an issuer or domestic concern, through and together with its officers, directors, employees, or agents, while in the territory of the United States, to willfully and corruptly make use of the mails and means and instrumentalities of interstate commerce and to do any act in furtherance of an offer, payment, promise to pay, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendant SOCIÉTÉ GÉNÉRALE, SGA, the Investment Management Firm, and others, in obtaining and retaining business for and with, and directing business to SOCIÉTÉ GÉNÉRALE, SGA, the Investment Management Firm, and others, contrary to Title 15, United States Code, Section 78dd-3.

19.        In furtherance of the conspiracy and to effect its objects, the defendant SOCIÉTÉ GÉNÉRALE and at least one of the defendant's co-conspirators committed and caused to be committed, within the Eastern District of New York and elsewhere, at least one of the following:

OVERT ACTS

(a)     On or about April 28, 2008, SOCIÉTÉ GÉNÉRALE sent a wire transfer of approximately $19.8 million through SOCIÉTÉ GÉNÉRALE's New York branch to the Panamanian Company's account at SOCIÉTÉ GÉNÉRALE in Zurich, Switzerland.

(b)     On or about May 9, 2008, the Libyan Intermediary sent a wire transfer of approximately $7.5 million from the $19.8 million received from SOCIÉTÉ GÉNÉRALE to a relative of a Libyan official.

(c)     On or about May 9, 2008, a SOCIÉTÉ GÉNÉRALE employee and the Libyan Intermediary traveled to New York City through John F. Kennedy International Airport to meet with a Libyan official.   While in New York, the SOCIÉTÉ GÉNÉRALE employee discussed several potential transactions with the Libyan official.   The SOCIÉTÉ GÉNÉRALE employee also provided the Libyan official and the Libyan Intermediary with multiple days of entertainment in New York.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Transmit False, Misleading and Knowingly Inaccurate Commodities Reports)

20.     The allegations contained in paragraphs one through 16 are realleged and incorporated as though fully set forth in this paragraph.

21.     In or about and between May 2010 and October 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SOCIÉTÉ GÉNÉRALE, together with others, did knowingly and willfully conspire to deliver and cause to be delivered for transmission through the mails and interstate commerce by telephone, telegraph, wireless, and other means of communication false and misleading and

knowingly inaccurate reports concerning market information and conditions that affected and

tended to affect the price of one or more commodities in interstate commerce: to wit, SOCIÉTÉ

GÉNÉRALE engaged in a scheme to submit false and misleading USD LIBOR rates to the BBA

via Thomson Reuters, so that it would appear to the public that SOCIÉTÉ GÉNÉRALE was able

to borrow money at lower rates than the rates that were actually available to SOCIÉTÉ

GÉNÉRALE, contrary to Title 7, United States Code, Section 13(a)(2).

22.    In furtherance of the conspiracy and to effect its objects, the defendant

SOCIÉTÉ GÉNÉRALE and at least one of the defendant's co-conspirators committed and

caused to be committed, within the Eastern District of New York and elsewhere, at least one of

the following:

OVERT ACTS

(a)    On or about June 14, 2010, SOCIÉTÉ GÉNÉRALE submitted a

USD LIBOR contribution in the three-month tenor of 0.5525.   On that same day, SOCIÉTÉ

GÉNÉRALE borrowed money in the market at interest rates ranging from 0.58 to 0.63.

(b)    On or about June 16, 2010, SOCIÉTÉ GÉNÉRALE submitted a

USD LIBOR contribution in the three-month tenor of 0.5525.   On that same day, SOCIÉTÉ

GÉNÉRALE borrowed money in the market at interest rates ranging from 0.61 to 0.65.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

SANDRA L. MOSER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

10